Luis Polo Forastieri, demandante y apelante, v. White Star Bus Line, Inc., demandada y apelada.

Núm. 7520.—*Sometido:* Abril 26, 1938. *Resuelto:* Febrero 9, 1939.

244

*F. Prieto Azúar,* abogado del apelante; *Celestino Iriarte, F. Fernández Cuyar* y *H. González Blanes,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

La demandada, en una acción de daños personales que se alega fueron causados por negligencia en el manejo de una de sus guaguas, luego de ciertas negativas, adujo como defensas afirmativas las siguientes:

"Alega la demandada que si en el sitio, fecha u hora en que se dice ocurrieron estos hechos, acaeció algún accidente por virtud del cual Luis Polo Forastieri sufriera algún daño, dicho accidente se debió, si existió, única y exclusivamente a la negligencia, imprudencia y descuido de dicho demandante, no concurriendo negligencia alguna de parte de la demandada.

"Alega asimismo la demandada que si en el sitio, fecha u hora en que se dicen ocurrieron los hechos, acacció algún accidente por virtud del cual Luis Polo Forastieri sufrió algún daño, y asumiendo que en el mismo medió negligencia de parte de la demandada, la causa próxima de dicho accidente, si existió éste, se debió única y exclusivamente a la negligencia contributoria de dicho demandante."

Durante el juicio se permitió a la demandada que presentara prueba tendiente a demostrar que las lesiones recibidas por el demandante fueron el resultado de un accidente inevitable. Se señala esto como error.

Convenimos enteramente con el juez de distrito en que por regla general la parte demandada puede, en una negativa general de supuesta negligencia, descansar en la teoría de accidente inevitable. La única duda que hemos tenido ha sido si—en vista de las negaciones específicas que ahora están ante nos (que omitimos en interés de la brevedad) y de las defensas afirmativas indicadas en el párrafo anterior—la regla debe ser seguida en el presente caso. Un cuidadoso examen de toda la prueba nos ha convencido, sin embargo, de que el demandante no fué inducido a error por la alegación de la demandada ni en realidad sorprendido durante el juicio por la prueba de ésta relativa a la supuesta naturaleza inevitable del accidente. Sea ello como fuere, si luego de examinar toda la prueba llegáramos a la conclusión de que la negligencia de la demandada fué un factor que contribuyó sustancialmente a las lesiones recibidas por el demandante, entonces el error al admitir la prueba ofrecida en apoyo de la teoría de la demandada sobre el llamado accidente inevitable, de haberlo, puede considerarse como no perjudicial.

 Polo, policía insular que de momento no se hallaba de servicio, tomó durante las horas de mucho tránsito del mediodía una de las guaguas de la demandada en la Avenida Ponce de León, en la parada 15. Hubo prueba que tendía a demostrar que la guagua estaba atestada de público y que había personas de pie en el pasillo interior. De todos modos, Polo permaneció de pie en la plataforma delantera o en el estribo. En la parada 16 el conductor detuvo el vehículo repentinamente a fin de evitar arrollar a una niña que trataba de cruzar o que aparentemente se disponía a cruzar la Avenida. Polo fué lanzado del estribo y lesionado. Hubo prueba tendiente a demostrar que inmediatamente antes del accidente, la guagua caminaba a una velocidad mayor a la

autorizada por la ley para la zona urbana de un municipio. El juez de distrito resolvió que Polo fué culpable de negligencia contribuyente y en apoyo de su resolución citó el caso de *Hubbard* v. *Bartholomew,* 144 N.W. 13, al efecto de que:

"Un policía que no estando de servicio y que mientras viaja en el automóvil de otra persona sufre lesiones como resultado de un choque, incurre en negligencia contribuyente al permanecer callado y permitir que el conductor del vehículo lo guíe a una velocidad prohibida por la ley, y en su consecuencia no tiene derecho a recobrar indemnización por las lesiones sufridas."

Según el artículo 18 de la "Ley para reglamentar el uso de vehículos de motor en Puerto Rico, y para otros fines," aprobada el 13 de abril de 1916 (leyes de ese año, Ley núm. 75, págs. 144, 152 y 153) la infracción de cualquiera de las disposiciones de dicha ley será considerada como delito menos grave. Los artículos 12 (*a*) y 13 (*a*) leen así:

"Artículo 12 (*a*).—Las personas que manejen vehículos de motor en los caminos públicos, deberán, en todo tiempo, ejercer el debido cuidado y tomar precauciones razonables para garantizar la seguridad de vidas y propiedades."

"Artículo 13 (*a*).—La velocidad de un vehículo de motor deberá en todo tiempo regularse con el debido cuidado, tomando en cuenta el ancho, tráfico y uso del camino; y el hecho de conducir, en cualquier tiempo, un vehículo de motor por un camino público, a una velocidad que exceda de 48 kilómetros por hora, o dentro de la zona urbana de un municipio a una velocidad mayor de 24 kilómetros por hora, constituirá evidencia prima facie de que el vehículo era conducido sin el debido cuidado."

El delito definido por el artículo 13 (*a*) es la conducción temeraria de un vehículo. La parte final del inciso (*a*) establece meramente una regla de evidencia. No prohibe el conducir un vehículo a más de 48 kilómetros por hora en cualquier camino público o a más de 24 kilómetros por hora en la zona urbana de un municipio. El conducir un vehículo de motor a más de 48 kilómetros por hora en un camino público o a más de 24 kilómetros por hora en la zona urbana de un municipio puede constituir o no un delito de acuerdo con las

circunstancias. El debido cuidado y la debida consideración a las condiciones del tránsito y al ancho y uso del camino son los factores determinantes en cada caso. El conducir a más de 48 kilómetros por hora en un camino público o a más de 24 kilómetros por hora en la zona urbana de un municipio equivale a lo sumo, meramente a lo que el estatuto dice, o sea, evidencia prima facie de que el vehículo era conducido sin el debido cuidado. Cuando en el caso existe otra prueba sobre el debido cuidado, la velocidad es tan sólo una en un número de circunstancias a ser tomadas en consideración al resolver la cuestión de negligencia. Si en el presente caso las circunstancias concurrentes fueron tales que indiquen que la velocidad del vehículo luego de salir de la parada 15 y antes de llegar a un punto muy cercano de la parada 16 no envolvía riesgo alguno para los pasajeros que viajaban en la guagua ni para otras personas que usaban la carretera y si Polo no tenía razón alguna para creer que la velocidad del vehículo no sería reducida antes de llegar a la parada 16, a él no le incumbía, ni como policía ni como pasajero, informar al conductor del vehículo que corría a más de 24 kilómetros por hora. Sea ella como fuere, si Polo, luego de darse cuenta del hecho de que la guagua caminaba a más de 24 kilómetros por hora no tuvo tiempo y oportunidad razonables para comunicarse con el conductor, el dejar de llamarle la atención a éste no sería óbice para lograr una indemnización. .

Ramón Acevedo, que fué el primer testigo del demandante, estaba de pie en la parada 16, esquina de la Avenida Ponce de León y Calle de San Juan. Dijo él que la guagua frenó y dió tres *cantazos*. Pasaban muchos vehículos. La avenida era ancha. En el contrainterrogatorio declaró que el *frenazo* fué lo que le hizo ver la guagua; vió la guagua antes del *frenazo;* la guagua viajaba rápidamente; no estaba mirando la guagua mientras ésta se acercaba, pero cuando se aplicaron los frenos notó la velocidad que ésta traía; no vió la guagua antes de frenar. La guagua se detuvo a la derecha de la carretera junto a los rieles del tranvía. Cuando se

aplicaron los frenos y el testigo viró la cabeza, el policía aún estaba dentro de la guagua. Después que el testigo oyó el *frenazo* el policía cayó para adentro y entonces cayó fuera acostado. El testigo viró la cabeza y vió la guagua por primera vez al oírla patinar. Cuando el testigo vió la guagua por primera vez ésta bajaba una pendiente; desde ese momento y luego de patinar ésta caminó como 65 pies. La guagua se detuvo después de pasar la esquina de la Calle de San Juan. Se aplicaron los frenos frente al sitio en que el testigo estaba parado y la guagua se detuvo frente a la tienda de cinco y diez, o sea, corrió todo el ancho de la calle de San Juan. La calle de San Juan es lo suficientemente amplia para acomodar dos automóviles. La aplicación de los frenos fué violenta, muy violenta. Había mucho tránsito en dirección a Santurce y un número de guaguas. Por espacio de dos minutos la guagua que causó el accidente fué la única que pasó. Otras pasaron después del accidente. Durante dos o tres minutos antes del accidente no había pasado ninguna otra guagua, ni ningún automóvil. El testigo no recuerda acerca de los automóviles.

Pablo Cuebas, caminero del Gobierno, esperaba una guagua. Ésta se detuvo rápidamente, dijo, a gran velocidad. El policía salió de la guagua y cayó a la carretera. Cayó por la puerta de entrada que está a la derecha de la guagua. Cayó sobre la carretera, dió una vuelta y cayó sobre la vía, sobre los travesaños. Salió por la puerta de entrada, de adentro de la guagua. Cayó sentado de espaldas. Que en ese punto la carretera tiene una ligera pendiente. La guagua corría cuesta abajo. Bastante ligero. Paró más abajo como a un par de metros del sitio donde cayó el policía. Se paró violentamente. La guagua iba bastante ligero. La carretera es regular de ancho. Caben como tres carros. Tiene doce metros de ancho. Es una de las carreteras más anchas que hay. Es de bastante tránsito de vehículos. Ese día había mucho tránsito. Las guaguas iban llenas de gente. Eran como las doce o las doce y cinco. El testigo esperaba la guagua en

la parada donde éstas se detienen. La parada no estaba marcada en la carretera, pero las guaguas siempre se detienen allí. Había otras guaguas antes y detrás. Una línea de "tráfico." La guagua estaba en aquella línea. En aquella línea corrían bastante ligero. Los automóviles también corrían rápidamente. El testigo no era chófer. Podía decir más o menos si un vehículo viajaba despacio o ligero. Todos corrían a mayor velocidad. El testigo no puede recordar si otros vehículos corrían frente a la guagua. Había otras guaguas de Río Piedras detrás. Había otra guagua como a diez o catorce metros detrás. Esta segunda guagua no chocó con la que causó el accidente. Las otras guaguas refrenaron, pero no hubo choque. La guagua se detuvo como a diez metros después de pasar la calle de San Juan y como a dos metros del sitio donde cayó el policía. Durante la repregunta el testigo declaró que vió la guagua a una distancia de quince o veinte metros antes de llegar a la parada donde él estaba esperando. La distancia entre el sitio donde la guagua estaba cuando el testigo la vió por primera vez y el lugar en que se hallaba al aplicarse los frenos por primera vez era como de veinte metros. La carretera hace una parada antes de entrar a la calle. El testigo oyó el ruido producido por los frenos y miró para ver qué ocurría; miraba hacia San Juan y la guagua ya le había pasado cuando oyó los frenos. La guagua le había pasado como un metro cuando oyó los frenos. El testigo miraba hacia San Juan y cuando oyó los frenos miró en dirección contraria. Oyó el ruido. La guagua no se detuvo rápidamente. No se detuvo al aplicársele los frenos por primera vez sino cuando se le aplicaron por segunda vez. El accidente ocurrió después de haber pasado la guagua el sitio donde estaba parado el testigo mirando hacia San Juan. Cuando el testigo oyó el ruido miraba hacia San Juan esperando la guagua que iba a tomar. Oyó el ruido de los frenos, viró la cara y vió al policía caer de espaldas. La guagua iba llena de pasajeros, en los asientos, en el pasillo y en todas partes. El policía iba de pie.

El testigo lo vió caer. Cuando el testigo oyó los frenos miró hacia Río Piedras. Cuando el testigo oyó los frenos Polo salió del interior de la guagua.·

Aurelio Muñiz Cintrón iba en el segundo asiento, a mano izquierda entrando, es decir, a la derecha de la guagua mirando hacia adelante. Había como ,diez pasajeros de pie. Polo iba de pie agarrado del tubo donde se coloca el cajón para echar los *tickets,* como a metro y medio de donde estaba el testigo. La velocidad de la guagua al llegar a la parada 16½ era, a juicio del testigo, fuera de lo normal, como 35 millas por hora. Empezando la 15, la carretera va descendiendo. Es uno de los tránsitos más grandes que tiene Santurce. El testigo sabe manejar vehículos de motor y los ha tenido por siete años, habiendo poseído cuatro marcas distintas de carros. Casi vive en las guaguas. El chófer trató de frenar, pero por la velocidad que llevaba no pudo parar de momento sino que arrastró y entonces volvió a frenar. Su maniobra fué brusca. En el primer empujón todos se fueron hacia el frente, incluyendo el policía. Cuando frenó por segunda vez la guagua, el policía perdió el control de donde estaba agarrado, se fué para afuera y cayó en el pavimento de espaldas. La carretera allí era estrecha y de mucho tránsito. Apenas hay espacio para más de tres o cuatro vehículos. El testigo ha visto muchos accidentes en ese sitio. Durante las horas de mucho tránsito las guaguas siempre llevan pasajeros de pie.

Durante la repregunta: Polo estaba de pie con la mano izquierda agarrado del tubo. La guagua paró y se fueron todos hacia adelante. Con la primera retrancada Polo se fué hacia adelante. La guagua continuó y volvió a retrancar. Polo perdió el control y salió despedido de la guagua. En la segunda parada se volvió "así"; al golpe de la guagua "hizo así" y luego volvió hacia atrás. Entonces la guagua volvió a refrenar. La despedida fué violenta, Polo perdió el control y cayó de espaldas al pavimento. La guagua hizo tres retrancadas en pocos segundos. Cuando vienen

ligero es imposible que paren en la primera retrancada. La forma en que Polo salió disparado fué instantánea. Polo estaba aquí y de repente está en el suelo. Vió que se fué para adelante a la segunda retrancada. Entonces miró para afuera. En la segunda retrancada se desprendió de la guagua por completo. Había varios vehículos delante de la guagua. El testigo no sabe si había algunos detrás. La guagua no le pasaba a ningún otro vehículo. El testigo no recuerda los automóviles que iban delante de la guagua.

Epifania Serrano declaró que la guagua iba bastante ligero. Se detuvo en la parada 16. La testigo vió al demandante en la guagua. Iba parado en el medio de la guagua con una mano en el tubo de la guagua y la otra en el de los vellones. Tenía una capa en el brazo. Cuando la guagua frenó, dió unos cuantos brincos y él se fué hacia el frente. Se dió en la frente un golpe y entonces se fué de espaldas y cayó en la carretera. Ella iba en el tercer asiento del lado derecho, parte de adentro. La guagua venía bastante ligero, bien ligero, y la guagua metió los frenos tan enérgicamente que dió tres brincos. Cuando frenó fué que Polo se fué hacia el frente y cayó de espaldas en la carretera. El día del accidente había mucho tránsito tanto delante como detrás de la guagua. La guagua pasó la parada 16 y se detuvo al pasar la calle de San Juan. La guagua iba bastante ligero, muy ligero, y al aplicársele los frenos dió tres golpes duros. Polo estaba de pie y como es tan alto estaba medio inclinado. Tenía una mano puesta en el tubo y la otra en la caja de los vellones y como los golpes fueron tan violentos se fué hacia adelante y se dió en la frente. La testigo vió cuando Polo cayó de espaldas hacia la brea, por donde pasa el *trolley*. La parada fué violenta, muy violenta. Los pasajeros se fueron para adelante. La guagua estaba completamente llena. La gente no salió disparada por la puerta para afuera, no se salieron de los asientos. Los que estaban parados junto a Polo se fueron para adelante, pero no se cayeron. Polo, que iba agarrado de los tubos, fué el

único que se cayó. Él era el único que estaba en la caja de los vellones. Él estaba parado junto a la ventanilla que da al frente. Los otros estaban de pie detrás de él. La testigo estaba a la derecha del asiento. Polo estaba de pie frente a la ventana del lado derecho de la guagua.

Juan Torres Vega, chófer con doce años de experiencia, declaró que estaba de pie frente a la tienda de cinco y diez en la parada 16 y mandó parar la guagua. Calcula que la guagua iba a una velocidad como de treinta millas por hora. El conductor refrenó la guagua y ésta paró de golpe. El policía salió despedido por la puerta para afuera. La guagua quedó trancada violentamente. La parada fué brusca. Polo cayó de espaldas. Salió de la parte delantera de la guagua. Cayó boca abajo. Ya había caído y trató de incorporarse, cayó de espaldas. Durante la repregunta al testigo dijo que al momento del accidente estaba empleado con la White Star como suplente; para la época del juicio el testigo hacía dos años o dos años y medio que no trabajaba para la White Star. Como un mes después del accidente había dejado la compañía, había dejado de trabajar para la White Star Line debido a un disgusto con el Sr. Arcelay. El testigo no fué encarcelado por ese disgusto. Fué un disgusto personal. El testigo no amenazó al Sr. Arcelay con un revólver. Fué el miedo de Arcelay el que obligó a éste a llamar al Jefe Lloréns. El testigo vivía en la carretera y como tenía que estar allí, Arcelay se imaginó que lo estaba acechando; entonces el testigo fué sorprendido por dos policías en la carretera y llevado al cuartel donde el Jefe Lloréns le dijo que no debía matar a Arcelay, que Arcelay era una persona buena. El testigo entonces le dijo a Lloréns que por su mente nunca había pasado eso. El testigo renunció voluntariamente, no le quitaron la placa, no lo despidieron. Tuvo un disgusto con Arcelay por haberle puesto dos meses de castigo y él entregó la placa antes de cumplir.

El mismo Polo declaró que él iba agarrado con la mano izquierda del tubo de entrada de la derecha, un poco encor-

vado porque el techo es algo bajito y le molestaba. El testigo tiene cinco pies diez pulgadas de alto. Llevaba una capa en la mano. "La guagua iba corriendo libremente porque llevaba su pasaje completo." El conductor, al pasar la calle de San Juan cerca de la tienda de cinco y diez, la detuvo repentinamente y refrenó tan enérgicamente que todos los pasajeros se fueron para el frente y como el testigo era el primero se dió con la parte de la tabla que está más arriba del cristal y se quedó atontado y en la otra refrenada salió del piso y al tratar de afirmarse encontró el vacío del estribo y se fué de lado. Cuando trató de afirmarse había perdido el agarre. Cayó de espaldas y como la caja es tan bajita lo empujó y lo siguió arrastrando. La refrenada fué una de sorpresa, violenta. En la repregunta el testigo explicó que con la frase "corriendo libremente" había querido decir que la guagua no había tenido intención de detenerse en la parada regular. Había pasado la parada. No había reducido la velocidad, según hacían otras, para detenerse antes de llegar al cruce de la calle. Corría como a 35 millas por hora, el testigo notó eso. Preguntado por qué no llamó la atención del chófer sobre la velocidad del vehículo, el testigo contestó que a veces cuando se les llama la atención sobre asuntos de esa índole contestan que ellos son gobierno. Preguntado por el juez si había presentado denuncias contra los chóferes de la White Star, el testigo contestó afirmativamente. Preguntado respecto al resultado contestó que éstos nunca habían sido convictos. Preguntado por la demandada si cuando los conductores decían que ellos son gobierno el testigo les permitía que violaran la ley y que hicieran lo que les daba la gana, contestó que en una ocasión uno de ellos le había desobedecido sobre las luces diciendo que para eso tenían su representante, "para eso somos gobierno." "Ser chófer de la White Star es ser gobierno." Preguntado si no había llamado la atención del chófer hacia el hecho de que infringía la ley, el testigo contestó negativamente. Preguntado si se daba cuenta de que el chófer estaba infringiendo la ley

y actuando negligentemente contestó: "Bueno, negligentemente no, porque iba guiando bien." La guagua iba ligero, pero el chófer iba en todo su conocimiento. Iba en su estado normal. El testigo agregó que el límite de velocidad era de 24 millas. Dijo que la guagua no tenía *espidómetro*. Preguntado por el juez cómo sabía que la guagua viajaba a 35 millas por hora el testigo contestó que había corrido detrás de ellas en motocicleta y les ha pasado por detrás a los automóviles y los ha marcado, y por la práctica. El testigo agregó que esas guaguas son muy veloces. Preguntado por la demandada si sabe que la guagua iba a más de 24 kilómetros por hora el testigo respondió: "Ésa es la verdad." El testigo no le llamó la atención al chófer en ningún momento. Él no creyó que había peligro alguno porque sabía que llevan la precaución de no chocar. Preguntado si no consideraba peligrosa tal velocidad, el testigo contestó afirmativamente, pero explicó que no se le puede llamar la atención al chófer por ciertas cosas. Ningún policía lo hace. Preguntado sobre las motocicletas el *testigo* contestó que ésas son para los *velloneros*.

Para los fines de esta opinión podría admitirse que mientras un policía viaja en una guagua, ora esté en servicio o fuera de él, tiene una responsabilidad algo mayor que la del pasajero corriente al tratar con un conductor temerario. Algún campo para esa diferenciación puede hallarse en el hecho de que una pequeña admonición de parte de un funcionario policíaco puede ser más efectiva que lo sería al venir de otra persona. Sin embargo, en uno u otro caso debe haber algún peligro obvio o alguna negligencia por parte del conductor, pues de lo contrario no hay razón para que se dé un consejo oficiosamente, y no incumbe a un policía ni a ningún otro pasajero hacer tal indicación. No importa cuál sea el deber de un policía, su deber como pasajero—eliminando la posibilidad de que exista una distinción como la que acabamos de indicar—es el mismo que el de cualquier otro pasajero. Cuanto la ley exige de un pasajero es que ejerza cuidado ordinario

para su propia seguridad. Ni siquiera al pasajero que sea un conductor de experiencia se le requiere que tenga la vista fija en el *espidómetro*. No es menester que esté pendiente de todo para que descubra el peligro imprevisto e insospechado. Él puede, sin que se le acuse de negligencia contribuyente— a menos que el peligro sea obvio, a menos que el conductor esté bajo la influencia del licor o de que por alguna otra razón se encuentre en un estado fuera de lo normal, o sea manifiestamente incompetente, temerario o negligente—descansar y dejar la conducción y manejo del vehículo al chófer, voltearse en su asiento y conversar con otros pasajeros, leer un libro o un periódico o cerrar sus ojos y dormirse. No hay razón para que se exija mayor cuidado a un policía meramente porque es tal policía.

En el presente caso nada hay que demuestre la distancia caminada por la guagua entre las paradas 15 y 16. Nada hay que denote el punto entre estas paradas en que la guagua desarrolló una velocidad de más de 24 kilómetros por hora. Nada hay que revele que la guagua corría a más de 24 kilómetros por hora antes de llegar a un punto dentro de la inmediata vecindad de la parada 16. Aun si apareciere lo contrario, nada hay fuera del exceso de velocidad mismo que demuestre que tal velocidad era peligrosa antes de llegar a un punto cercano a la parada 16. Nada hay que demuestre que hubiera cruces o calles transversales entre las paradas 15 y 16. Se desprende sí que la guagua corría por la derecha de la Avenida, que la mayor parte del ancho de la Avenida estaba a su izquierda y que los rieles del tranvía se hallaban a la derecha entre la propia línea ocupada por ella y el extremo exterior de la Avenida. La guagua era uno de tantos vehículos de motor que se movían en la misma dirección aparentemente a más o menos la misma velocidad. Estas circunstancias concurrentes, sin más, eran más que suficientes para contrarrestar y destruir la presunción estatutaria de que la velocidad a que corría el vehículo—de ser en realidad más de 24 kilómetros por hora—era antes de

llegar a un punto cercano a la parada 16, temeraria o negligente. Si antes de llegar a un punto entre las paradas 15 y 16 Polo se dió cuenta del hecho (de serlo) de que la guagua corría a más de 24 kilómetros por hora, él estuvo muy en lo cierto al llegar a la conclusión de que la mayor velocidad no constituía negligencia. Nada hay que demuestre que él tuviera tiempo u oportunidad razonables para advertir al conductor antes del accidente y luego de ser aparente que no iba a detener la guagua en la parada 16 o para reducir la velocidad antes de llegar a ese punto.

■ No hallamos base satisfactoria para la conclusión a que llegó el juez de distrito de que Polo fué culpable de negligencia contribuyente.

El hecho, de serlo, de que Polo estaba parado con un pie en el piso de la plataforma delantera y con otro en un escalón interior bajo el nivel del piso, no parece haber impresionado al juez de distrito. Él no lo discute en relación con la cuestión de negligencia contribuyente. Sea ello como fuere, no equivalía a tal negligencia.

■■ La prueba del demandante tendió a demostrar que la guagua paró a una señal de Juan Torres Vega, a quien ya hemos mencionado como testigo del demandante. La de la demandada tendió a demostrar que el chófer aplicó los frenos para evitar estropear a una niña que se proponía o trataba de cruzar la carretera. En cuanto a este aspecto del caso la corte de distrito descartó definitivamente la teoría del demandante y adoptó la de la demandada. La corte también resolvió que la súbita parada ocasionó que Polo cayera desde la plataforma de la guagua. No discutió el punto de la negligencia de la demandada al correr la guagua a más de 24 kilómetros por hora como causa próxima del accidente, ni tampoco la tentativa de la niña de cruzar la carretera como causa interventora. Su única conclusión específica (fuera de la cuestión de daños) fué que Polo había sido culpable de negligencia contribuyente al no llamarle la atención al chófer de que la guagua corría a mayor velocidad. Esta conclusión

resolvió la contención de la demandada de que la guagua corría a menos de 24 kilómetros por hora inmediatamente antes del accidente. Por tanto, no hemos creído necesario discutir la prueba aducida por la demandada en apoyo de esa contención.

No es éste el caso de un niño que no estaba a la vista o que no hace señal alguna de su intención de cruzar una calle antes de correr súbitamente frente a un automóvil que se mueve a una velocidad permisible entre dos bocacalles, como sucedió en *Aguayo* v. *Municipio de San Juan*, 35 D.P.R. 425. No es éste el caso de un peatón que, mientras camina por una acera que está entre dos bocacalles repentinamente abandona la acera y se sitúa frente a un vehículo que pasa, cuyo chófer no tenía razón alguna para anticipar tal proceder. Véase *Pueblo* v. *Castillo*, 45 D.P.R. 872. No es éste el caso de un viandante que sale frente a un automóvil estacionado y se coloca dentro de la ruta de otro automóvil que corre a una velocidad moderada. *De García* v. *Figueroa & Gautier*, 52 D.P.R. 897. La lectura de la opinión emitida en el caso de *Meléndez* v. *Alvarez*, 35 D.P.R. 343, bastará para distinguir ese caso.

Eloy Rodríguez, pasajero de la guagua, declaró como testigo de la demandada, que allí había una bocacalle antes de la Clínica Santurce ''y de allí salió una niñita.'' El testigo vió muy bien a la niñita. Al preguntársele a qué lado de la carretera yendo de San Juan hacia Santurce estaba la niña, contestó: ''Antes de la clínica, de la vía del ferrocarril para la calle. *Cruzó la guagua.''* Cuando el testigo vió la niña por primera vez ella estaba como a 50 pies de la guagua. Antes de cruzar la niña, el chófer aplicó los frenos. Estaba como a 50 pies de la guagua cuando empezó a cruzar. Ella cruzó casi en ángulo recto, de la vía hacia la carretera. Preguntado si la niña iba corriendo o andando, contestó: ''corriendo.'' Preguntado qué hizo el chófer cuando la niña empezó a correr frente a la guagua, contestó: ''metió el freno y la guagua paró. A la niña nada le pasó milagrosamente.''

Carlos Matías, otro pasajero de la guagua, declaró que el accidente ocurrió un poco más allá de la parada 16. El testigo conocía la tienda de 5 y 10 que hay allí. Fué por la Clínica Santurce. Al momento del accidente una niñita cruzaba la calle y el chófer aplicó los frenos. Preguntado si cruzó corriendo o andando, contestó que una niñita cruzaba rápido, y el chófer se vió obligado a frenar violentamente. La guagua se había detenido en la parada 16 y el accidente ocurrió más allá de esa parada. Preguntado si la guagua estaba cerca o lejos cuando la niña empezó a correr, el testigo contestó: "Estaba cerca, la niña cruzó de frente; venía tráfico de los dos lados, y el chófer paró." La niña tenía 9 ó 10 años. Allí había una acera ancha frente a la Clínica Santurce y había una tienda.

Luisa Freyre, otro pasajero, declaró que un hombre que iba en la guagua gritó: "La mató," y la testigo vió correr a una niñita. Entonces se aplicaron los frenos y Polo cayó. La testigo vió a la niña mientras la guagua se movía, y ella estaba así (indicando con la mano). La niña tenía de 7 a 8 años. Cruzaba de derecha a izquierda. Salió de la acera que está frente a la Clínica Santurce hacia el frente. Salía de por allí porque allí fué que ocurrió el accidente, frente a la clínica. Al preguntarse a la testigo cómo ella desde su asiento a la izquierda detrás del chófer podía ver la niña cruzar de derecha hacia izquierda, contestó que cuando vió la niña ésta pasó la acera, y que fué entonces que ella oyó que gritaron "la mataron". Preguntada nuevamente cómo la testigo, desde su asiento, podía ver la niña cruzar, contestó que la vió perfectamente, a pesar de que había dos asientos con cuatro pasajeros, el chófer y la caja de los vellones delante de ella, y de que Polo iba parado en el escalón; que la testigo la vió porque estaba adentro donde queda la ventanilla.

Emilio Martínez, el chófer de la guagua, declaró que era chófer de la White Star Bus Line; que había estado trabajando como chófer hacía diez años; que al llegar a la parada

16½ había una niña de edad escolar, uniformada, con sus libros, parada en la vía; y el testigo la vió hacer un ademán como si fuera a cruzar la calle y redujo la velocidad un poco. Entonces vió que la niña se tiró y dió él una frenada violénta. Preguntado si la aplicación de los frenos se debió a que la niña venía corriendo por la calle, el testigo contestó: "Sí, señor, cuando la niña salió corriendo. a cruzar la calle la guagua estaba cerca de ella." Era una escolar, como de 9 años de edad; al frente había una tienda de mercancías; allí está la calle de San Juan, no había policía. El accidente ocurrió a la entrada de la calle de San Juan. Esta calle está dos o tres casas más acá de la Clínica Santurce.

La guagua de la demandada, inmediatamente antes del accidente, llegaba a una parada de costumbre, en el cruce de una calle—sitio que los peatones que desean cruzar la avenida durante las horas de menor tránsito naturalmente escogerían por ser menos peligroso que otros, como por ejemplo, entre paradas o entre bocacalles. Nada hay en la evidencia que indique que la vista del chófer de la guagua estuviera obstruída. Aún si esto hubiera sido así, ello debió haberle inducido a reducir la velocidad antes de llegar a la parada o antes de tratar de pasar por un sitio en el cual podían encontrarse peatones en el momento en que trataran de cruzar la carretera. No era un novato en el manejo de vehículos de motor. No necesitaba que nadie le informara de la velocidad a que corría. Sabía que iba cuesta abajo, en un vehículo pesado, con bastante carga. Sabía que Polo estaba parado a su lado en la plataforma, o con un pie en el piso de la plataforma y el otro en el escalón. Había en Pablo Cuebas por lo menos un pasajero en perspectiva, al lado de la calle de San Juan, que vió la guagua 15 ó 20 metros antes de pasar el sitio donde él estaba parado. El accidente ocurrió junto a la calle de San Juan o luego de pasar ésta, después que la guagua había cruzado el sitio donde Cuebas estaba parado. Si la niña, al ser vista por

el chófer por primera vez, estaba parada en la vía del tranvía, el chófer ha debido darse cuenta de que la niña estaba probablemente esperando una oportunidad para cruzar la avenida, o que tal vez trataría de cruzarla en la primera oportunidad, aún antes de ella haber hecho "algún ademán de que iba a cruzar la calle." Evidentemente no esperaba una guagua ni un tranvía en el sitio donde estaba parada. En cambio, si la niña había salido de la acera y se movía hacia la avenida, conforme indican las declaraciones de Luisa Freyre, y la de Eloy Rodríguez, supra, el chófer se ha debido haber dado cuenta igualmente de que ella intentaba cruzar la avenida. La manifestación del chófer al contestar una pregunta sugestiva del letrado de la demandada al efecto de que los frenos fueron aplicados "cuando la niña empezó a cruzar la calle"—considerada a la luz de su testimonio hasta ese punto—no es muy convincente. Nada encontramos en la situación de la intersección de la calle de San Juan y sus cercanías para neutralizar el hecho, según concluyó la corte de distrito, de que la guagua corría a más de 24 kilómetros por hora—hecho que por disposición expresa del estatuto constituye evidencia prima facie de negligencia.

A excepción de una o dos preguntas relativas al asiento que ocupaba la testigo Luisa Freyre y a la posible obstrucción de su vista, el letrado del demandante—bajo la impresión de que el examen de repregunta de los testigos de la demandada podía resultar inconsistente con objeciones sobre la admisibilidad de toda la prueba que tendía a demostrar que el accidente fué inevitable—se abstuvo de hacer tal examen de repregunta. Los mismos testigos que declararon en torno a la forma en que la niña trataba de cruzar la avenida, también declararon que la guagua corría a 10 ó 15 millas por hora. El juez de distrito rechazó esta parte de sus declaraciones y aceptó como ciertas las declaraciones de los testigos del demandante, varios de los cuales dijeron que la guagua corría como a 35 millas por hora. Estos mismos testigos declararon que fué necesario que se aplicaran los

frenos tres veces para que el vehículo se detuviera por completo. La forma en qué Polo fué lanzado de la posición que ocupaba en la plataforma delantera, tiende fuertemente a corroborar el testimonio de estos testigos tanto en lo relativo a la velocidad a que corría la guagua como en lo pertinente a la forma en que ésta se detuvo. El mismo conductor del vehículo admite que primero redujo la velocidad al hacer la niña ademán de cruzar la carretera, y que aplicó los frenos posiblemente por segunda vez cuando ella empezó a correr o corrió frente a la guagua. De este testimonio se deduce lógicamente que el chófer vió la niña, bien cuando estaba parada en la vía, al otro lado de la calle de San Juan, antes de llegar y de cruzar la parada, o por lo menos antes de ella hacer el primer ademán que indicaba su intención de cruzar la avenida. Si corría a una velocidad mucho mayor de 15 millas por hora, y si no redujo esa velocidad hasta el momento en que la niña, según su declaración y las de otros testigos de la demandada, cruzó frente a la guagua, su negligencia fué continua y continuó interviniendo como una causa concurrente, próxima y eficiente del accidente. A no ser por su negligencia el accidente no hubiera ocurrido, o por lo menos ejerciendo el debido cuidado, el resultado probablemente se hubiera mitigado esencialmente.

Parecería superfluo agregar que no es éste un recurso iniciado por otra persona que usa la vía pública o por una persona que como invitada va dentro del vehículo, para recobrar del dueño o conductor de un vehículo de motor no dedicado al transporte de pasajeros mediante paga. Se trata de un recurso iniciado por un pasajero contra un porteador público. Al conductor de una guagua se le exige que ejercite cuidado más de lo ordinario para la seguridad de sus pasajeros. La cuestión relativa a si el conductor o dueño de un vehículo de motor no dedicado al transporte de pasajeros mediante paga, sería o no responsable de las lesiones sufridas por una persona que viaja en el vehículo como invitado o por otra que usa la vía pública, en iguales o similares

circunstancias, no está ante nos. En su consecuencia, no es necesario resolverla ahora.

En el "Restatement of the Law of Torts," Vol. 2, pág. 1161, sec. 432, hallamos lo siguiente:

"A no ser conforme se ha dicho en el inciso (2), la conducta negligente del actor no es un factor sustancial del daño causado a un tercero, si tal daño hubiera ocurrido aún si el actor no hubiese sido negligente.

"(2) Si dos fuerzas operan activamente, la una debido a la negligencia del actor, y la otra no debido a ninguna conducta reprochable de su parte, y cada una de ellas de por sí es suficiente para producir daño a la otra parte, el jurado puede resolver que la negligencia del actor es un factor sustancial en la producción del daño."

El artículo 439 lee como sigue:

"Si los efectos de la conducta negligente del actor intervienen activa y continuamente en el daño ocasionado a un tercero, el hecho de que los efectos del acto inocente, torticero o criminal de esa otra persona, sea también un factor sustancial en la producción del daño, no exime al actor de responsabilidad."

Véanse también 45 C. J. 939, 940, sec. 499, y *Cruz v. Frau*, 31 D.P.R. 92.

*La sentencia de la corte de distrito debe ser revocada y en su lugar este tribunal dictará otra en favor del demandante por la suma de $1,020, con las costas pero sin incluir en ellas honorarios de abogado.*

El Juez Asociado Sr. Wolf disintió. *

El Juez Asociado Sr. De Jesús no intervino.